## EVIDENCE OF CONSPIRACY UNDER THE VALENTINE ANTI-TRUST LAW.

[Circuit Court of Erie County.]

HENRY HUGHES v. STATE OF OHIO, AND H. C. WEBSTER ET AL v. STATE OF OHIO.

Decided, January 12, 1907.

*Valentine Anti-Trust Law—Sufficiency of Indictment Under—Venue— What Acts Fall Within—Unconstitutional Feature as to the Competency of Proof—Discretion of the Court—As to Introduction of Evidence after Close of Defense—Inadmissible Form of Question Relating to Conversations Between Conspirators—Evidence Establishing Existence of Illegal Combination—Can not be Done by General Reputation—Employe, to Warrant his Conviction, Must have had Knowledge of Character of Combination.*

1. An indictment charging defendants with being a trust combination in violation of the Valentine Anti-trust law, from March 10, 1900, and continuing until March 9, 1903, and further charging violations of said law during that time, is not demurrable or subject to motion to quash on the ground of duplicity, in that each day of the existence of such an alleged combination constitutes a separate offense under Section 4427-4, and that the indictment attempts to charge numerous offenses in one count.

2. It is within the discretion of the court to grant permission to the prosecution to introduce additional evidence in chief after the close of the defense, and after requests for instructions to the jury have been passed on.

3. After having exhausted the memory of a witness his attention may be drawn to a particular subject-matter of conversations; but it is error to permit a question suggesting to him the very statement desired, and secure his assent thereto.

4. To bring a prosecution under the Valentine Anti-trust act within the venue of a particular county, the illegal combination must have been entered into in such county, or some act must have been committed therein, in furtherance of the unlawful purposes of such combination.

5. Evidence of statements, conversations and conduct of alleged conspirators, not a part of the transactions charged in an indictment under the Valentine Anti-trust law, but offered to establish the

existence of the alleged illegal combination, is not admissible against a defendant who was not present and did not concur in such statements, conversations or conduct.

6. A defendant in a prosecution of a trust combination, under the Valentine Anti-trust law, is deprived of his right to a decision of a jury as to his guilt or innocence, and deprived of his liberty or property without due process of law by the operation of Section 4427-6, which provides for the proof of the existence of an illegal combination by the establishment of its general reputation as such; and therefore that portion of said statute is unconstitutional and invalid.

7. In a prosecution under the Valentine Anti-trust law, a charge to the jury, "If defendant was an employe of any such unlawful combination * * * or did knowingly carry out any of the stipulations or purposes * * * of any such unlawful combination, * * * then you would be warranted in finding him guilty," is erroneous in that it might result in a conviction for being an employe of a combination, or carrying out any of its purposes without having knowledge of its unlawful purpose or character.

WILDMAN, J.; PARKER, J., and HAYNES, J., concur.

Error to Erie Common Pleas Court.

In the court of common pleas on March 9, 1906, the plaintiffs in error, Henry Hughes, H. C. Webster, W. H. Lyons, W. N. Cleveland, J. H. Hilton, the Massillon Bridge Company, the King Bridge Company, the Bellefontaine Bridge Company, the Canton Bridge Company and the Mount Vernon Bridge Company, were jointly indicted with other defendants for alleged violation of the Valentine Anti-trust law, Section 4427-1, *et seq.*, Revised Statutes. Two of the plaintiffs in error, the Massillon Bridge Company and the Canton Bridge Company, are not now prosecuting their proceeding in error.

The defendant, Hughes, was tried separately to a jury and convicted. The other defendants waived a jury, and the case by their consent was submitted to the court on the recorded evidence in the Hughes case. All the defendants were adjudged guilty and each of them was fined $500, except Hughes, who was fined $1,000.

Prior to these proceedings, except the finding and presentation of the indictment, motions to quash, pleas in abatement and demurrers were filed and overruled by the court. All defendants

except Hughes waived any claimed errors in such rulings, and those of them who are prosecuting this error proceeding base their prayer for a reversal substantially on the ground that the evidence does not justify the judgments of conviction.

The defendant, Hughes, preserved his exception to the overruling of his motion to quash the indictment and numerous other exceptions in the subsequent stages of the case. The accusation embodied in the indictment, which, under these exceptions, it becomes important to examine, is substantially as follows:

That the defendants on March 10, 1903, "at the county of Erie aforesaid, and from and since the said. tenth day of March, aforesaid, in the year 1903 aforesaid, continually until the day of finding this indictment, to-wit, the ninth day of March, in the year of our Lord 1906, engaging then and there in a conspiracy against trade, then and there unlawfully were members of, acted with and in pursuance of and knowingly aided and assisted in carrying out the purposes of a certain trust, the purposes of which said trust were then and there to increase the price of certain commodities, to-wit highway bridges, superstructures of said highway bridges, structural bridge iron and structural bridge steel, and to prevent competition in manufacturing, transportation, and sale of said commodities, the said trust being then and there a combination of capital, skill, and acts by the said persons .and corporations aforesaid for the purposes aforesaid, and the said corporations being then and there corporations duly organized, existing, and doing business in said state of Ohio, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Ohio."

The motion to quash attacks this indictment upon the grounds of indefiniteness and duplicity. The statute (Section 4427-4) provides that each day's violation of this act "shall constitute a separate offense," and it is urged that this indictment by its "continuando" extending over a period of three years, attempts to charge numerous offenses in one count, and that this is not permissible.

Cases are cited to support this contention, but, without pausing to comment upon them, it is enough to say that in our judgment they are inapplicable to this kind of an offense as set forth in the indictment.

No emphasis in argument is placed on the point that the indictment is indefinite and does not sufficiently apprise defendant of the nature of the accusation against him. We will therefore pass the question without, however, indicating approval of the form which the charge has taken. It is probable that the defendant, Hughes, knowing in what transaction in Erie county he had been engaged in connection with bridges, was not prejudiced by any lack of particularity in the indictment.

We think that the indictment is not vulnerable to attack on other grounds and that the pleas in abatement and demurrers were not well taken.

The evidence taken on the Hughes trial and relied on by the state to justify the conviction of all the defendants, is presented to us in a printed pamphlet of something over two hundred pages, disclosing not only the testimony and exhibits and the instructions given and refused, but numerous exceptions to rulings of the trial court. We will not attempt specific reference to all of them, but will consider such as seem to demand special attention. Under the waiver by all defendants except Hughes and the submission of the case by them on the evidence on his trial, the various exceptions taken by him to the admission of evidence are not available to his co-defendants so far as those exceptions relate to the forms of questions or any matters other than the competency of the evidence itself. It is very manifest also that such co-defendants have no concern with refusals to instruct the jury as requested in the Hughes case, or with the charge of the court as given. Their trial was without the aid of a jury and no instructions were refused or given.

The defendant, Hughes, excepted (see page 190 of the printed record) to the permission granted by the court to the state to introduce additional evidence in chief after the closing of the

defense and after requests for instructions to the jury had been passed on.

The matter was within a discretion of the court, which seems to have been properly exercised. In the introduction of this evidence, however, a question was asked of the witness, E. U. Hirt, by the counsel calling him (see page 191), which we think should not have been permitted. The testimony related to a conversation with the defendant, Hughes, concerning the letting of a bridge at Fremont in March, 1906. The witness had stated the conversation as he seemed to recall it and added that what he had related was, he thought, the substance of all that was said. Thereupon counsel for the state asked:

"Did he say to you in words or in substance that there might be other bridge companies present, but that he could get them out of the way?"

The witness answered over defendant's objection:

"Yes, he did."

While it might have been proper after exhausting the memory of the witness to invite his attention to any particular subject-matter of conversation, it was not within the bounds of legitimate questioning by the attorney who had called the witness, to suggest to him the very statement desired and obtain his assent to such suggestion. The answer so elicited furnished the only important item of evidence from this witness, and the ruling of the court permitting it was both erroneous and prejudicial. It was not justified by any apparent unwillingness on the part of the witness to testify favorably to the state, or by any adverse interest, nor was it justified as impeachment of Hughes by any sufficient foundation previously laid therefor.

Although the charge in the indictment did not define the particular manner, or set forth the transaction or transactions in which it was claimed that the defendants in Erie county "aided and assisted in carrying out the purposes" of the alleged trust, said purposes being "to increase the price of certain bridges," and to "prevent competition in manufacturing, making, trans-

portation and sale'' of them, the evidence on the trial, so far as related to conduct of the defendants in Erie county, was directed by the state to transactions occurring in the summer of 1903, in the public letting of bids for the repair of what is known as the Fries Landing bridge.   While all the defendants are charged with being members of the alleged trust during the entire period of three years from March 10, 1903, to March 9, 1906, there is no evidence that they did any acts in Erie county during said period, in furtherance of the alleged purposes of the trust, unless they did them in direct connection with the Fries Landing bridge. The language of the trial judge in one paragraph of his charge as found on page 195 of the printed record is pertinent, as showing his understanding, with which we are in accord, of the claims of the state in this respect.   I quote a part of this paragraph as follows:

''I will say to you further in regard to this matter it is not claimed by the state that any of the parties named in the indictment are residents of Erie county, or that any trust or unlawful combination among the defendants named in the indictment has a permanent residence or existence in Erie county; but the state claims that such unlawful combination exists and did exist on the day named in the indictment or thereabouts, and that about that time the defendant in this action, who is now being tried, Henry Hughes, acting for and on behalf of such unlawful combination, to carry out some of the purposes prohibited by the terms of the law which I have heretofore read to you, came into Erie, county and did knowingly carry out some of the stipulations, purposes, prices or rates of such unlawful combination and orders thereunder, or in pursuance thereof in manner and form as charged in the indictment.''

Our conception of the spirit and purpose of the statute under which this case was instituted and prosecuted is, that it was not contemplated that a member of an unlawful combination as defined, might be indicted in any or every county of the state wherein he or any of his associates should chance at any time to be.   To give the Erie county court jurisdiction some offense must have been committed in Erie county.   The entering into an unlawful combination, or the doing of any overt act in furtherance of its unlawful purposes would be such an offense.

In this case, then, the state was compelled to base its prosecution upon either (1) the entering into such a combination in Erie county; or (2) the aiding of such a combination previously formed in this county or elsewhere.

The second of these theories is the one apparently adopted by counsel for the state, and, further, that the unlawful combination was formed outside of Erie county and several years prior to the date of the offense charged in the indictment.

In support of this latter theory and to establish the fact of a pre-existing combination among the defendants, evidence was offered and received of transactions in other counties and conduct and statements of defendants other than Hughes and not in his presence, or, so far as appears, within his knowledge, at divers times from about the year 1898, the year in which the Valentine act took effect, to some time subsequent to the alleged unlawful transactions in Erie county. The view of the trial judge as to the admissibility of this class of evidence is expressed in his language as quoted on page 16 of the printed record. In reply to the objections of defendant's counsel, he says:

"They have a right to establish acts a reasonable time before and a reasonable time after the date of the offense charged, for the purpose of assisting the jury to determine whether or not at this particular time a trust existed."

But statements and conduct of alleged conspirators in the absence of a defendant, have never, we believe, been deemed competent to prove his complicity with them in their unlawful combination. Upon adequate proof that a conspiracy exists and that a defendant has entered into it, he is bound by the conduct of his confederates in furtherance of their common unlawful purposes. Each conspirator is the agent of his fellows to this extent. But the principle goes no further. As the authority of an agent can not be shown by his own hearsay admissions or statements, so the conduct or hearsay statements of alleged conspirators in the absence of claimed associates can not be used to establish their association.

As an illustration of this class of evidence admitted on the trial of Hughes over his objection reference may be made to the

testimony of John J. Dun, beginning on page 15 of the printed record. He was an agent for the J. G. Wagner Company in the bridge business from some time in April, 1898, prior to the taking effect of the Valentine law, until the fall of 1899. He testifies as to various transactions during that period, tending to show arrangements among some of the companies named in the indictment and others in violation of the statute if entered into after it took effect in July, 1898. Hughes does not appear to have been present at these transactions or to have had knowledge of them, or, indeed, to have been employed as agent by any of the defendant companies until the fall of 1901. The testimony of Dun could have no legitimate effect against him, and his objection to it should have been sustained. As appears on page 20 of the printed record, the judge said, as to a part of this testimony relating to the bridge lettings in Cincinnati:

"The jury will understand this evidence is only competent in case the prosecutor connects it with some of the companies named in this indictment."

But, although indicted, none of the companies were on trial, and the evidence was then being introduced against Hughes alone. Upon his entering into relations with the Massillon Bridge Company as its agent in the fall of 1901, he can not be presumed to have had knowledge of any secret and unlawful dealings of that or any other companies at least two years earlier.

Another important item of evidence admitted over objection is found on page 202 of the printed record. It consists of correspondence had between the Canton Bridge Company and its own agent, H. G. Hammond, in the year 1903, concerning bridges in Lorain and Huron counties and proceedings relating thereto. Language in this correspondence strongly suggests some combination among this company, the Massillon Bridge Company and the King Bridge Company, as to a pooling of profits on these bridges, and perhaps others; but even if it had clearly recited such an arrangement and had mentioned Hughes as a party to it, the correspondence would not have been admissible against him, in the absence of any showing that he had knowledge

of it and assented to it, to prove that he was engaged in the combination.

These are examples of what we deem objectionable items of evidence introduced on the trial. We hold that wherever during the progress of the trial the principles which I have endeavored to express were violated, the court erred.

An even more important line of testimony and one which seems vital to the case, was admitted by the court against objection and considered in the charge to the jury in the following words, found on page 194 of the printed record:

"The law prescribes a rule of evidence which you will consider in determining the question as to whether or not there was in existence at the time named in the indictment or thereabouts a combination or trust in violation of the sections which I have heretofore read to you. You will see from it that it is not necessary to have direct evidence of the existence of such combination or trust. Its character may be established by general reputation, that is, what people generally say about it. You will look to all the evidence on this head, including the evidence of the reputation of the so-called bridge trust, which is the subject of investigation in this prosecution, and determine from it whether or not there was in existence a trust or combination in violation of the law which I have read to you, in manner and form as charged in the indictment."

This instruction and the testimony on which it was based call for a careful examination of the statute. Such grave doubts as to the proper construction and the constitutional validity of the section concerning evidence of the reputation of an alleged trust have existed in the minds of lawyers and judges of the state, that in most, if not all, the prosecutions in other counties under the act, convictions have not been sought by means of such evidence. Up to the present time, so far as we are advised, despite the fact that there have been a number of such prosecutions, neither the Supreme Court nor any of the circuit courts have been called upon to give special attention to the section of the statute referred to. It is numbered in the present revision Section 4427-6, and is as follows:

"In prosecutions under this act, it shall be sufficient to prove that a trust or combination, as defined herein, exists, and that the defendant belonged to it, or acted for or in connection with it, without proving all the members belonging to it, or proving or producing any article of agreement, or any written instrument on which it may have been based; or that it was evidenced by any written instrument at all. The character of the trust or combination alleged may be established by proof of its general reputation as such."

The last sentence above is the one on which emphasis must be placed in the present inquiry, but the rest of the section should not be ignored.

It is urged with force and plausibility by counsel for plaintiffs in error that the existence of the combination or trust must be proved by evidence other than that of reputation; and that it is only the character of the combination, after its existence has been so shown, that can be established by reputation.

We have been much impressed by the reasoning in support of this construction, but we are unable to adopt it. It is "the character of the trust or combination alleged" that "may be established by proof of its general reputation," and it is its "general reputation *as such*" that is to be received; that is, its general reputation as being such a combination as the statute defines and makes criminal. The trial court was in our judgment correct in construing the section as attempting to authorize the proof of the very existence of the criminal combination.

Counsel for the state seem to have gone somewhat further and to have assumed in at least some of their questions the right to prove by repute not only the existence of the combination, but the membership of the defendants in it. To illustrate: As shown on page 33 of the printed record, the following question was asked of the witness, Graham:

"You may state whether it is or is not a fact that the Massillon Bridge Company, with other bridge companies and persons, were generally reputed in this county to be organized in a combine for the purpose of preventing competition in the sale of highway bridges and bridge material since the first day of January, 1903, or during any part of that time."

Perhaps inadvertently the court permitted the question to be answered as follows:

"That is the general reputation, as far as I know."

It may be noted in passing that the question calls for evidence of reputation during a period extending even to the time of the trial, and the answer of the witness is in the present tense.

To what extent any bad reputation of the defendants may have been created or increased by the very fact of this prosecution does not appear, but it may fairly be said that an indictment and prosecution under it are not such a testimonial of character as to enhance whatever good repute an accused person or company may have had.

Questions asked of witnesses as shown on pages 61, 62, 63, 65, 71, 73 and perhaps on other pages, are of like character and objectionable for the reasons which I have given.

It remains to be seen whether the section of the statute which I have quoted and which the judge correctly interpreted in his charge to the jury, is such an enactment as the Legislature had power to make.

Our Supreme Court has recognized the legislative power to prescribe the rules of evidence which shall be observed by its judicial tribunals; but as stated by Judge Bradbury in the case of *The Pennsylvania Co. v. McCann,* 54 Ohio St., 10, 17, "limited only by the constitutional guaranties respecting the due process of law, vested rights and the inviolability of contracts."

Article XIV, Section 1, of the Federal Constitution prescribes that:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Does the section of our statute providing that the existence of a criminal combination or trust may be established by its general reputation as such, attempt to deprive any person of life, liberty or property "without due process of law?"   That the enforce-

ment of the statute may involve a deprivation of liberty or loss of property by imprisonment or fine, is manifest. This may not be done except by due process of law.

From time immemorial accused persons have been tried upon evidence direct or circumstantial, documentary or oral, and, as to some facts and under some circumstances, general reputation has been treated as competent.

As to one class of cases, the maintaining of brothels, the ill fame of a house has often, but not always, been permitted; and the like rule has sometimes been applied to the character of a groggery or dram shop. This procedure in the case of such nuisances when places or houses of this character were defined or treated as such, existed long before the adoption of the Federal Constitution which I have quoted. Such procedure was deemed "due process of law" at that time in the jurisdictions where it was sanctioned. In Ohio, however, we have no adjudication by the Supreme Court recognizing the competency of such evidence. The decisions of lower courts as to evidence of general reputation under the Winn law prohibiting the selling of liquor in *reputed* houses of prostitution are not relevant to the present inquiry.

But we are not advised that even under the semi-barbarous practice which obtained and for many years existed under the common law, evidence that an accused person was generally reputed to have committed the crime charged against him was ever permitted in other classes of cases. In the section of our statute under investigation the Legislature attempts to enact a wide departure from legal principles which have stood undisturbed for ages, in jealous protection of private rights.

True, the statute does not in terms say that the criminality of an accused person may be shown by his bad reputation; but as we construe it, and as we think its framers intended it, it does provide that the guilt of the association of which the accused may be a conceded member, may be established by such reputation.

In this connection I invite the reading of the forceful language of the Supreme Court of Rhode Island in *State* v. *Beswick*, 13 R. I., 211 (43 Am. Rep., 26), and especially page 216 and following.

If the Legislature may, to make convictions more easy in alleged violations of this act, provide that guilt may be so established, it is difficult to see why other crimes, equally difficult to establish by legitimate proof, may not be so shown.

Nearly all crimes are committed in secret, and convictions are often difficult, but it would be perilous indeed to open wide the door and say that we must find an easier way and will permit convictions on rumor, however general. Bad reputation is too often artfully created for wicked purposes, and at the best is too uncertain and perilous to admit of its use to such extent.

Never before in our experience have we noted such open trials of accused persons in public places and public prints before the investigation by a jury, and for the obvious purpose of manufacturing public sentiment adversely to the accused, as have been made manifest of late. We can not consent to uphold an enactment, the certain result of which is to make more mischievous a public sentiment so created.

The opportunity afforded by such a statute to an interested and unscrupulous attorney, by insinuations and accusations, to manufacture a public sentiment which may be utilized for the conviction of the accused, is manifest. Fortunately, the members of the bar who will descend to such dishonorable and unprofessional practices are not numerous, but they are not unknown to the profession. It is needless to say that such conduct would be impossible to the high-minded and honorable lawyer who, as prosecuting attorney, represented the state in the present case.

Before leaving the question, I should add my judgment that the language of the section requires the construction that the effect of the general reputation, if proven, not merely testified to, is to establish, that is to say, make certain, the criminal character

As defined by Webster, to "establish" is "to make stable or of the combination or trust.
firm, to fix or set unalterably; to settle, to confirm."

Anderson defines it: "To settle certainly, fix permanently, what was before uncertain doubtful or disputed."

The words of the section were unhappily chosen if the Legislature intended only a *prima facie* rule.

Construed as I understand the language, a defendant is deprived of his right to the decision of a jury as to his guilt or innocence and may be deprived of his liberty or property without due process of law.  We deem the provision of Section 4427-6 embodied in its last sentence unconstitutional and invalid.

This evidence, so permitted and used by the jury and the court below, was vital to the state's case.  The other evidence was insufficient, unaided, to establish the guilt of the defendants or any of them.

As the cases will necessarily be remanded to the court below, it is proper to consider other claimed errors in the record.  These are based upon refusals to instruct the jury as requested by the defendant, Hughes, and upon the charge as given.

Several of these requested instructions involved the claim that the defendant could not properly be convicted of furthering the purposes of an unlawful combination unless he had knowledge of its existence.  The court was not required under our criminal procedure to give such instructions before argument, although requested so to do; nor to give them at all in their precise phraseology; but the substance of the proposition claimed should have been somewhere embodied in the general charge in clear terms. This, we think, was not done, or if done, its force was destroyed by language found on page 195 of the printed record, in which the court charged as to Hughes that "If he was * * * an employe of any such unlawful combination, * * * *or* did knowingly carry out any of the stipulations or purposes * * * of such unlawful combination * * * then you would be warranted in finding him guilty." The knowingly carrying out the purposes of a combination, and the knowing of the existence of a combination of an illegal character, are not so clearly identical as to justify the instruction in this alternative form.  The instruction, if followed, might result in a conviction for furthering purposes of a combination without knowing of the illegality of the combination; or even for being an employe of a combination without knowledge of its unlawful purposes or character.

There is language in other parts of the charge tending to cure, but not clearly doing so, this misleading instruction and the error in not charging substantially as requested.

The requested instructions numbered 7 to 12, inclusive, restricting the use to be made by the jury of certain items of evidence, should have been given in substance. The court, by not so instructing, and, indeed, by the language of the general charge permitted their use generally in the case.

While some of these items of evidence were competent as to certain of the defendants, their unqualified use as against the defendant, Hughes, was erroneous and prejudicial.

The judgments below are reversed and the causes remanded for further proceedings.

*King & Ramson, Hunt & Garn, Kinney, O'Farrell & Rimelspach, G. C. Beis, Waight & Moore, Kline, Tolles & Goff* and *Webber & Turner,* for plaintiffs in error.

*R. H. Williams,* contra.